**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

Rand Corporation,

                         Plaintiff,

v.                                                    Civil Action No. 07cv510 (ADM/JSM)

Yer Song Moua; Manisy Moua; and
 John Doe and Mary Rowe,

                         Defendants.

_____

**MEMORANDUM OF LAW IN SUPPORT OF RAND CORPORATION'S
MOTION FOR SUMMARY JUDGMENT**

_____

## <u>INTRODUCTION</u>

Rand Corporation ("**Rand**") respectfully submits this Memorandum of Law in support of its motion for summary judgment on Count I of its Complaint, which if granted, moots its alternative claims in Counts II –IV.  Count I of the Complaint seeks a declaratory judgment with respect to the parties' rights and obligations surrounding a past mortgage loan transaction, and specifically, a determination that (1)  Rand fully complied with its TILA and HOEPA notice and disclosure obligations and gave the Mouas proper notice of their rescission rights on April 22, 2005, (2)  the Mouas did not detrimentally rely upon the overstated APR or any other disclosure of the interest rates, (3)  the Mouas failed to timely exercise any rescission rights by April 26, 2005, (4) Rand's Mortgage and its subsequent foreclosure of the Mortgage were valid and enforceable, (5) their damage claims under TILA and HOEPA are barred by the one year statute of limitations, and (6) Rand is the lawful owner of the Property due to the expiration of the statutory redemption period, and entitled to immediate possession of the Property.

One year after the closing of their mortgage loan transaction with Rand, the Mouas were in default in making their mortgage payments, and faced with an impending foreclosure.  Rather than reinstate their defaults, they began a year long effect, with the assistance of legal counsel, to create an extended right to rescind their mortgage loan, even though federal law limited them a three-day period after closing in which to rescind the transaction.

The Mouas' Answer and Counterclaim and their TRO Memorandum of Law contains unfounded and inflammatory references to the loan closing directly causing Mr. Moua to suffer a heart attack and stroke,[1] predatory lending labels, and an unlikely theory about Rand scheming to hide the actual terms of the mortgage loan from the Mouas prior to closing, even though the undisputed facts prove that the Mouas worked with Rand for over three months prior to closing, and received complete TILA and HOEPA disclosures of their financing three months before closing.  Nevertheless, the Mouas now claim that:

> "Rand carefully ensured that no details about the financing were communicated to the Mouas prior to closing."

(Memorandum in Support of Defendants' Application for a Temporary Restraining Order ("**Defendants' TRO Memo**"), p. 7.)  The undisputed facts clearly disprove their story, and much of their factual allegations are simply unrelated to actual events relevant to a resolution of the legal issues in this matter.  The narrow issues under TILA, HOEPA and Minnesota state law depend upon only a limited number of undisputed facts that are verifiable from the loan closing documents.

---

[1] Rand intends no offense or ill will toward Mr. Moua for any health issues for which he may be suffering, but takes issue with being accused of causing the serious health conditions.

For these reasons, Rand respectfully requests that the Court grant its Motion for Summary Judgment on Count I of its Complaint, and dismiss all affirmative defenses and counterclaims by the Mouas in their entirety and on the merits.

## STATEMENT OF UNDISPUTED FACTS

Defendants Yer Song Moua and Manisy Moua currently reside at 2438 Arlington Avenue East, Maplewood, MN 55119, which property is legally described as follows:

> Lot 7, Block 1, Oak Ridge Estates 3rd Addition, according to the recorded plat thereof, Ramsey County, Minnesota,

("**Property**").  (Affidavit of Albert Miller ("**Miller Affidavit**"), ¶ 3.)  On or about January 5, 2005, the Mouas applied for a mortgage loan with Rand to refinance their existing mortgage and redeem from a sheriff's foreclosure sale that occurred on December 2, 2004, subject to a six month redemption period expiring on June 2, 2005.  (Id. at ¶ 4.)

On April 22, 2005, the Mouas closed on the refinancing through Rand, and executed and delivered a Promissory Note to Rand in the original principal amount of $245,000.00 ("**Note**").  (Id. at ¶ 5; Ex.1 to Complaint.)  The stated interest rate in the Note was **13.99%** for the first twelve (12) payments beginning June 1, 2005, and stepped up to **14.99%** for the remaining 49 payments due before the July 1, 2010 maturity date of the Note.  (Miller Affidavit at ¶ 6; Ex. 1 to Complaint.)  To secure repayment of the indebtedness evidenced by the Note, the Mouas simultaneously executed and delivered a Mortgage, dated April 22, 2005, and filed with the Ramsey County Recorder's Office on April 28, 2005, as Document Number 3851666, covering the Property ("**Mortgage**"). (Miller Affidavit at ¶ 7.)

On or about January 5, 2005,[2] and again on the date of closing, April 22, 2005, Rand provided the Mouas with all required disclosures, and amended disclosures, pursuant to the Federal lending statutes, the Truth in Lending Act ("**TILA**") and Home Ownership and Equity Protection Act ("**HOEPA**").  (Id at ¶ 8; Ex. 2 to Complaint.)

Multiple attempts had been made in April of 2005 to close the transaction because the Ramsey County Sheriff failed to timely provide redemption payoffs in advance of closing. (Miller Affidavit at ¶ 9; Ex. 3 to Complaint.)  Due to the pending redemption period set to expire in 41 days, the need to redo all loan documents, update all payoffs with other creditors, and the risk of losing loan approval if the closing were rescheduled past April 22, 2005, the Mouas decided on or about April 21, 2005 to proceed with the closing the next day.  (Miller Affidavit at ¶ 10.)

Because TILA and HOEPA normally required Rand to give amended disclosures three days before closing, the Mouas chose to waive their three-day waiting period based upon a bona fide personal financial emergency.  (Id. at ¶ 11.)  On the day of closing, the Mouas handwrote their waiver of the three-day waiting period, received their amended disclosures at closing on April 22, 2005, and acknowledged in their handwritten waiver letter that they still had their three-day right of rescission period after closing:

> We are Further aware That we have a 3 day rescission after signing the Closing Docs to review all The Final Documents.  We Feel That this will allow us Time to address any Concerns or questions.

(Id at ¶ 12; Ex. 4 to Complaint.)

---

[2] The Mouas originally requested a loan amount of $198,800.00 in January of 2005, at which time they were given proper notices and disclosures under TILA and HOEPA.  After they completed a sale of a separate commercial building on March 30, 2005, the Mouas requested an increase in loan amount from Rand to $245,000.00.  Thus, Rand was required to give the Mouas additional notices and disclosures under TILA and HOEPA.

The Mouas were given properly completed notices of their rescission rights at closing. (Miller Affidavit at ¶ 13; Exs. 5-6 to Complaint.)  The closing was held on April 22, 2005 at the Edina, Minnesota offices of Excel Title, and it is undisputed that no representative from Rand Corporation was present at the closing.  (Affidavit of Judy Lawrence ("**Lawrence Affidavit**"), ¶ 4.)  The Mouas clearly admit they were approached by a ReMax Results real estate agent, Patrick Aylward, not Rand, and that the alleged promises and misrepresentations were made by Aylward.  (Answer, Countreclaim and third-Party Complaint of Manisy Moua ("**Answer**"), ¶¶ 9, 19-26, 103.)  The Mouas further admit that the Excel Title closer, not Rand, conducted the closing and either directed them to sign various documents or failed to provide them with information.  (Id. at ¶¶ 39-41, 51.)[3]

The Notice of Right to Cancel accurately stated that the Mouas were entitled to cancel the transaction by MIDNIGHT on APRIL 26, 2005.  (Miller Affidavit at ¶ 14.)  The Mouas did not cancel the transaction with Rand on or before April 26, 2005 and allowed their three-day rescission rights to expire.  (Id. at ¶ 15.)  Excel Title, which had been hired to conduct the

---

[3] The Mouas counterclaim is filled with inflammatory accusations against Rand that are entirely unfounded, and in some instances, are directly contradicted by undisputed facts to the contrary.  For instance, the Mouas accuse Rand of scheming to make them close on the loan without ever providing the Mouas with information about their loan terms prior to closing.  Answer, ¶ 63.  The Mouas however cannot deny that they received all of the TILA and HOEPA disclosures of their loan terms on or about January 5, 2005, which was more than three months earlier. Complaint, Ex. 3.  Only the loan amount changed in April of 2005, based upon the Mouas' request to borrow additional funds after they failed to clear sufficient funds from the sale of their commercial building in March of 2005.  Additional accusations that are entirely without foundation, and must be disregarded by the Court, include references to Mr. Moua suffering a heart attack and stroke upon learning of the payment terms, Rand engaging in a pattern of making high rate mortgages to borrowers without an ability to repay.  A more reasonable  interpretation of the facts is that Mr. Mouas' total disability resulting from his health problems caused the Mouas to be unable to make their mortgage payments, which led to the foreclosure.  The facts relating to the Mouas choosing to fund three family funerals, instead of making their mortgage payments, is also without foundation, and clearly calculated to spin their financial straits into something different than what really happened.  Mr. Mouas' health issues are extremely unfortunate, and the defaults on their mortgage payments are understandable, but do not excuse their payments or entitle them to rescind or otherwise avoid their contract obligations.

closing, waited until April 27, 2005 to disburse the closing proceeds.  (Lawrence Affidavit at ¶ 6, Ex. 1 to Lawrence Affidavit.)

The Mouas received the full benefit from disbursement of the entire principal amount of $245,000.00.  (Miller Affidavit at ¶ 16; Lawrence Affidavit at ¶¶ 5-7; Ex. 1 to Lawrence Affidavit; Ex. 7 to Complaint.)  Of that amount, $221,964.00 was paid to the Ramsey County Sheriff to redeem the Property from a foreclosure sale that occurred on December 2, 2005.  (Miller Affidavit at ¶ 16; Ex. 1 to Lawrence Affidavit.)  $47,411.13 was paid to MGIC Credit Assurance Corporation.  (Id.)  $24,164.19 was paid for settlement charges.  (Id.)  Because the amount secured under the Mortgage was not adequate to satisfy all of the Mouas obligations, the Mouas paid $48,539.32 at closing, which funds they had obtained by selling a commercial building they owned in St. Paul, Minnesota.  (Miller Affidavit at ¶ 16.)

Despite the above-described benefits received by the Mouas, they defaulted under the terms of the Note and Mortgage for failure to make timely monthly payments for December 1, 2005, and all subsequent payments.  (Miller Affidavit at ¶ 17.)  Rand commenced a foreclosure by advertisement under Minnesota statutes, and executed a Notice of Pendency of Proceeding and Power of Attorney to Foreclose Mortgage on March 1, 2006.  (Id. at ¶ 18; Ex. 8 to Complaint.)  The Mouas were personally served with a copy of the Notice of Mortgage Foreclosure on March 15, 2006.  (Miller Affidavit at ¶ 19; Ex. 9 to Complaint.)

Instead of curing their mortgage defaults or commencing an action for unknown damages regarding an alleged invalid waiver of the three-day waiting period within the one-year statute of limitation, on or about April 11, 2006, the Mouas with the assistance of legal counsel, sent a letter to Rand indicating they were canceling and rescinding the Mortgage.  (Miller Affidavit at ¶

20; Ex. 10 to Complaint.)  The Mouas' rescission letter did not specify a basis for exercising

rescission rights beyond their three-day period that had already ended one year earlier.  (Miller

Affidavit at ¶ 21; Ex. 10 to Complaint.)

On May 3, 2006, Eric Cook, counsel for Rand, responded by a letter to the Mouas

denying their unsupported rescission efforts because Rand's loan file contained proper

documentation that the Mouas signed and received two (2) proper Notices of Right to Cancel

fully and properly completed, and in full compliance with TILA.  (Miller Affidavit at ¶ 22; Ex.

11 to Complaint.)

On May 4, 2006, the Property was sold at a sheriff's sale pursuant to mortgage

foreclosure proceeding by advertisement under Minnesota law.  (Miller Affidavit at ¶ 23.)  Rand

was the successful bidder at the sheriff's sale with a bid amount of $269,512.07.  (Id.)  The

Mouas did not redeem from the sheriff's foreclosure sale before the end of the statutory

redemption period that expired on November 4, 2006, and Rand is now the fee owner of the

Property.  (Id. at ¶ 24.)

On January 30, 2007, an eviction hearing was held.  (Id. at ¶ 25.)  On that date, the

Ramsey County Housing Court determined that Rand was entitled to lawful possession of the

Property and that the Mouas must vacate the Property.  (Id.)  A Writ of Recovery was issued in

accordance with the Court's Order.  (Miller Affidavit at ¶ 26.)  A move-out was scheduled with

the Ramsey County Sheriff for February 23, 2007.  (Miller Affidavit at ¶ 27.)  On February 22,

2007, counsel for the Mouas brought a Motion for a Temporary Restraining Order.  (Notice on

Hearing on Motion for a Temporary Restraining Order, dated February 22, 2007.)  On February

23, 2007, the Honorable Ann D. Montgomery issued an Order granting the Mouas' Motion for a

TRO pending the results of an expedited motion for summary judgment to resolve the legal issues on the merits.   (Order, dated February 23, 2007.)

## I.        SUMMARY JUDGMENT STANDARDS.

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219-20 (8th Cir. 1992).  Although the moving party bears the initial burden of showing that no genuine issue of material fact exists, *Celotex Corp.*, 477 U.S. at 323, a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.  In ruling on a motion for summary judgment, the court should not consider evidence, such as inadmissible hearsay statements or vague, conclusory allegations, which would not be admissible as evidence at trial.  *Id.*

The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *See Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). However, summary judgment should not be viewed as a disfavored procedural shortcut, but rather viewed as an essential part of the Federal Rules that assists the Court in securing a just, speedy and inexpensive determination.  *Celotex*, 477 U.S. at 327 (quotation omitted).

## II.   TILA AND HOEPA DID NOT PROVIDE THE MOUAS WITH A THREE YEAR RESCISSION PERIOD.

There was no legal basis under TILA or HOEPA for the Mouas to exercise rescission rights after they let their rescission rights expire on April 26, 2005, and certainly not a full year later.  No federal statute extended their rescission rights under the clear and undisputed facts in this case.  The handwritten waiver of the Mouas' three day waiting period <u>before</u> closing was irrelevant to any three day rescission right <u>after</u> closing.  It is undisputed that all TILA and HOEPA notices were given to the Mouas on or before the date of closing, and in proper form, which effectively limited their rescission rights to 3 days from the date of closing.  In fact, they were first given proper TILA and HOEPA disclosures <u>three months</u> before closing, and only the loan amount changed at their request in April of 2005.  *See, e.g., Ramsey v. Vista Mortgage Corp*, 176 B.R. 183, 188-189 (9th Cir. BAP 1994) (no additional disclosures required for a change in the amount financed:  "It would be a strange result indeed if we were to hold Vista liable for failing to 'disclose' to Ramsey an additional $3,000.00 of principal, when it was Ramsey himself would asked Vista to add that $3,000.00 amount to the loan balance.").

As a matter of law, the *de minimus* understatement of the APR for the first 12 months of the loan, and net overstatement by .65% of the APR for the remaining months, in the TILA Disclosure Statement were simply clerical errors that were within the stated tolerances for errors under TILA, particularly when raised after a foreclosure.  15 U.S.C. §1635(i)(2) (overstatements are not a violation after commencement of a nonjudicial foreclosure).  Federal cases that have addressed the overstatement issue also hold that an overstatement, in the absence of detrimental reliance, is not a violation of TILA at all.  *Ramsey v. Vista Mortgage Corp*, 176 B.R. 183, 188-189 (9th Cir. BAP 1994)(holding that a borrower is only entitled to the 3-year rescission period if

9

the borrower can demonstrate detrimental reliance on the overstatement, which Ramsey could

not do as a matter of law).  Finally, the Mouas most recent argument about extra signatures on

their Notice of Right to Cancel disclosures did not cause a TILA violation due to an improper

waiver of their rescission rights, and accordingly, their rescission rights were at all times limited

to three days.

Section 1635(a) (2006) of TILA limits a consumer's right to rescind a transaction within

three business days of the closing of the transaction or the delivery of the disclosures required under

TILA:

> . . . the obligor shall have the right to rescind the transaction until
> midnight of the third business day following the consummation of the
> transaction <u>or the delivery of the information and rescission forms
> required under this section together with a statement containing the
> material disclosures required under this subchapter</u>, whichever is
> later, . . . .

Section 1635(f) otherwise sets an outside limit of three years for a consumer to exercise rescission

rights, which provision only arises if the rescission forms and all material disclosures are not given

by the time of the transaction.  *See also* 12 C.F.R. § 226.23(a)(3).  If the rescission forms or material

disclosures are never given, the three year anniversary of the transaction is the rescission deadline.

Id.

In the present case, it is undisputed that the rescission forms were properly completed by

Rand and given to the Mouas at closing.  (Miller Affidavit at ¶ 8; In addition, Rand gave all material

disclosures under TILA and HOEPA at the April 22, 2005 closing, which as a matter of law, did not

contain any material disclosure misstatements.[4]  (Id.)  Thus, section 1635(f), the only provision

---

[4] The Mouas may rely on a couple of unreported or district court level cases from other jurisdictions to support their request for a three year rescission right, even though none of these cases provide the Mouas with an extended three year rescission right under the undisputed facts in the present case.  *Bynum v. Equitable Mortgage Group*, 2005 WL

under federal law that could possibly give the Mouas an argument for a three year right of rescission, does not apply in this case.

### A.   THE MOUAS' COMPLAINTS ABOUT THEIR HANDWRITTEN WAIVER LETTER IS A RED HERRING THAT RELATES SOLELY TO THEIR THREE DAY WAITING PERIOD, NOT THEIR RESCISSION RIGHTS.

The Mouas correctly argue that they were entitled to a three day waiting period before closing on their mortgage loan with Rand.[5]  However, the Mouas chose to waive that three day waiting period under the circumstances.  (Miller Affidavit at ¶ 11.)  The Mouas now claim they were not faced with a bona fide emergency, which normally would create a material fact question to be resolved by a trier of fact.  Fortunately, the potential fact dispute needs no resolution by a court or jury in this case, because it could not impact rescission rights in any way.  Section 1635 of TILA provided no basis for extending a three day rescission right into a three year rescission period based upon an improper waiver of the three day waiting period.  Theoretically, the Mouas could have tried to state a claim for damages under TILA, but they failed to do so within the clear and unmistakable one year statute of limitations found in 15 U.S.C. §1640.  While the existence of a bona fide emergency could be an open question, the

---

818619 (D.D.C. 2005)(HOEPA disclosure never given and understated finance charges were outside the TILA tolerances, which led to a 3 year rescission right); *Decision One Mortgage Company, LLC v. Fraley*, 238 F.3d 420, 2000 WL 1889700 (6th Cir. Unpublished disposition 2000)(HOEPA notices not given at closing, and when provided after the closing, the Fraleys attempted to rescind within 3 days of receipt of the HOEPAQ notices; court granted summary judgment in favor of lender for a "conditional rescission" to avoid giving the Fraleys a windfall); *Newton v. United Companies Financial Corp*, 24 F.Supp.2d 444 (E.D. Penn. 1998)(four consolidated cases involving a failure to give HOEPA notices and multiple other violations of HOEPA); Ray v. CitiFinancial, Inc., 228 F.Supp. 664 (D. MD 2002)(creditor entirely failed to give TILA or HOEPA notices and imposed unwarranted insurance charges on borrowers; focus of the case was entirely on whether to "condition" rescission and fashion equitable remedy).
[5] It is further undisputed that Rand gave the Mouas the required material disclosures on January 5, 2005, which was more than three months (not days) before closing.  The only change in the TILA and HOEPA disclosure documents was the loan amount increase, which increase was requested by and clearly known to the Mouas.  Federal courts have previously ruled that in such circumstances, where the only change in terms was one requested by and known to the borrower, did not require additional TILA or HOEPA disclosures be given to the consumer.  *Ramsey v. Vista Mortgage Corp.*, 176 B.R. 183, 187 (9th Cir. BAP 1994).

Mouas' lack of a three day waiting period <u>before</u> the transaction did nothing to deprive them of their three day rescission period <u>after</u> the transaction.

Both TILA and HOEPA provide an exception to the requirement that the disclosures required in section 1639(b) be provided at least three days prior to consummation of the transaction when there is a bona fide personal financial emergency. 15 U.S.C. § 1639(b)(3) (2006); 12 C.F.R. § 226.31(c)(1)(iii) (2006). The Mouas chose to waive this three-day waiting requirement based upon such a bona fide personal financial emergency. (Miller Affidavit at ¶ 11; Ex. 3 to Complaint.) Multiple attempts were made in April of 2005 to close the transaction because the Ramsey County Sheriff failed to timely provide redemption payoffs in advance of closing. (Id. at ¶ 9.) Due to the pending redemption period set to expire in 41 days, the need to redo all loan documents, update all payoffs with other creditors, and the risk of losing loan approval if the closing were rescheduled past April 22, 2005, the Mouas made the decision on or about April 21, 2005 to proceed with the closing the next day. (Id. at ¶ 10.) As a matter of public policy, Rand must be able to rely upon their decision, or the statute becomes a trap for the unwary.

The Mouas now argue that the handwritten waiver is invalid and that the Mouas are entitled to three years to rescind the loan rather than three days as provided in section 1635(a). Such argument is without merit and is an attempt to distract the Court from the real issues in this case. The waiver of the waiting period stems from a different statute and serves a different purpose than the waiver of rescission rights. As will be addressed below, there can be no reasonable argument that the Mouas intended to waive their three day rescission rights. Even if the Court found that the

handwritten waiver of the waiting period was invalid, the Mouas were still only entitled to a three-day rescission period, not a three-year rescission period.  U.S.C § 1635(f).

The only way a consumer is entitled to a three-year rescission period is if the disclosures are never provided.  Section 1635(f).  Other than this statutory provision,  no federal statute extends a three day rescission period into a three year rescission period.  The Mouas fail to produce any facts or legal arguments to invoke §1635(f) of TILA.  Thus, regardless of whether the waiting period waiver was valid, it is clear that Rand provided the Mouas with the required disclosures under TILA and HOEPA at closing, which limits their right to rescind to three-days from the date of closing, which is the date they received the disclosures.  (Miller Affidavit at ¶ 8; Ex. 2 to Complaint.)

## B. THE UNDERSTATEMENT/OVERSTATEMENT OF THE APR IS NOT A TILA VIOLATION AT ALL.

The TILA and HOEPA disclosures received by the Mouas on January 5, 2005, and again on April 22, 2005 were entirely accurate, except for the .09% understatement of the APR for the first 12 payments and net overstatement of the APR in the Disclosure Statement that did not damage the Mouas in any way, or induce detrimental reliance from the Mouas.  (Exs. 1-2 to Complaint.)  The Note rate of 13.99% for the first 12 payments was inaccurately disclosed at 13.90% (**understated**), which discrepancy of .09% is less than the statutory tolerance for disclosure errors of 1/8 of one percent (.125%).  15 U.S.C. §1606(c); 12 C.F.R. §226.22(a)(2). The Note rate of 14.99% for the next 49 payments was inaccurately **overstated** by about 9/10 of one percent (.91%).

Overall, the net effect of the overstatement/understatement was an APR that was **overstated** by about **.65%.**  (Exs. 1-2 to Complaint.)  Simply put, the mortgage loan was actually cheaper for the Mouas than disclosed in the TILA/HOEPA notices, which was to their

benefit and did not prejudice them in anyway.  (Lawrence Affidavit at ¶ 2.)  As a matter of law, because the Mouas were willing to pay a slightly higher rate than the true Note rate, the Mouas cannot show detrimental reliance on the disclosure overstatement.

Under TILA and Regulation Z, an overstatement does not *in itself* constitute a violation of the Act, without more, so as to create any rescission rights for the Mouas.  U.S.C. § 1602(z).  In enacting TILA and Regulation Z, Congress was more concerned about **understatements** in the actual APR, leading courts and commentators to find that overstatements absolve a creditor from liability or violation of TILA.  *Ramsey v. Vista Mortgage Corp*, 176 B.R. 183, 188-189 (9th Cir. BAP 1994) (holding that a borrower is only entitled to the 3-year rescission period if the borrower can demonstrate detrimental reliance on the overstatement, which Ramsey could not do as a matter of law).

For purposes of rescission rights, TILA also entirely excuses overstatements in the disclosure of finance terms after a judicial or nonjudicial foreclosure has occurred, which as a matter of law, treats such overstatement as an accurate material disclosure:

> . . . for the purposes of exercising any rescission rights <u>after the initiation of any judicial or nonjudicial foreclosure process</u> on the principal dwelling of the obligor securing an extension of credit, the disclosure of the finance charge and other disclosures affected by any finance charge <u>shall be treated as being accurate</u> for purposes of this section <u>if the amount disclosed</u> as the finance charge does not vary from the actual finance charge by more than $35 or <u>is greater than the amount required to be disclosed under this subchapter</u>.

U.S.C. 1635(i)(2).  Thus, after initiation of a foreclosure, overstatements are simply not violations of TILA that implicate rescission rights.  It is undisputed that Rand commenced and fully completed a nonjudicial foreclosure of the Mouas Mortgage.  In fact, the redemption period already expired, and Rand is the current owner of the Property.  (Miller Affidavit at ¶ 24.)  Thus,

based upon the plain meaning of the statute, Congress intended to protect lenders from spurious defenses raised by borrowers attempting solely to delay the inevitable.

In any event, the notices and disclosures were accurate except for the *de minimus* understatement and the overstatement upon which the Mouas did not detrimentally rely.  Rand therefore did not violate TILA or HOEPA, or fail to make an accurate material disclosure of the APR, so as to give the Mouas a continuing right to rescind the mortgage loan past their statutory three-day rescission period.  As such, the Mouas' right to rescind expired on April 26, 2005 with no rescission right exercised by the Mouas within this time period.  For this reason, the Mouas' attempt to rescind their mortgage loan with Rand almost a full year after the expiration of their three-day rescission period was ineffectual as a matter of law.

<blockquote>
C.   <strong>THE EXTRA SIGNATURES ON THE NOTICE OF RIGHT TO RESCIND DID NOT WAIVE THE MOUAS RESCISSION RIGHT IN VIOLATION OF TILA, SO AS TO EXTEND THEIR RESCISSION PERIOD TO THREE YEARS.</strong>
</blockquote>

The Mouas have attempted to manufacture rescission rights for the past year, beginning with their unsupported letter sent to Rand, purportedly written by the Mouas.  (Ex. I to Declaration of John M. Tancabel ("**Tancabel Declaration**".)  A number of unfounded arguments to create rescission rights have been raised and disproved over the past year while the foreclosure process ran its course.  The most recent theory put forward by the Mouas, and only first raised during the February 23, 2007 hearing on their motion for a TRO, relates to the extra set of signatures on one of the Notice of Right to Rescind forms.  (Id. at Ex. K.)  Somehow, the Mouas now argue they prematurely waived their rescission rights on the day of closing, because they signed their names at the bottom of the Notice of Right to Cancel form confirming they had not rescinded the transaction.

(Id.)  Normally, this form would only be signed after the rescission rights ended to evidence their

confirmation that they did not exercise rescission rights during their three day statutory period:

CONFIRMATION

More than 3 business days have elapsed since the date off the
new transaction and I/We received this Notice and Truth-in-Lending
disclosure with regard to the new transaction.  I/We certify that the
new transaction has not been rescinded.

_____          _____
Borrower/Owner        Date          Borrower/Owner        Date

(Lawrence Affidavit at ¶ 5.)  However, in this case, the Mouas signed their names in this section,

and above the word 'Date' each of them put the date of closing, "4-22-05" to confirm they did not

rescind.  (Ex. K to Tancabel Declaration.)  It is unknown when the Mouas actually signed the form

for the second time.  Regardless, this is clearly an error, and can only be explained in one of three

ways.  First, the Mouas could have returned to Excel Title on April 27, 2005 to confirm in writing

that they chose not to rescind (but mistakenly put the 4-22-05 date on form).  (Lawrence Affidavit at

¶ 5.)  Alternatively, and without any authorization from Rand, the Excel Title closer could have

asked or allowed the Mouas to sign the forms twice on the date of closing.  (Id.)  Finally, the Mouas

may have simply mistakenly signed in the extra blanks.  (Id.)  If the Excel Title closer did ask the

Mouas to sign twice on the date of closing, that's an issue between the Mouas and Excel Title, and

certainly did not cause the Mouas to lose their rescission rights with Rand.  (Id.)  This unknown fact

does not become a disputed material fact, and instead, has no impact on the resolution of the legal

issue of whether the Mouas had a right to rescind after the closing.

No matter what the explanation is for the "4-22-05" date in the Confirmation section of the

rescission form, one thing is certain as a matter of law:  the Mouas had a valid and enforceable right

16

to rescind the entire loan from the time of the closing, through midnight on April 26, 2005.  There can be no valid argument constructed that the Mouas actually waived their rescission rights at the time of the closing by signing twice on the Notice of Right to Rescind form.  In fact, the Confirmation section of the form says absolutely nothing about "waiving' any rescission rights, and instead speaks entirely of acknowledging that they had their three day right, and allowed it to elapse. (Ex. K to Tancabel Declaration.)  Any interpretation of the bottom of the rescission form as evidence that the Mouas intended to, or in fact did, waive their rescission rights is absurd.  Their extra signatures on the form cannot be interpreted to give them less rescission rights than Congress otherwise intended.

The pattern of this argument is self-serving for the Mouas.  They start by selecting a small portion of a rescission-related document from the closing that clearly has nothing to do with a statutory waiver of rescission rights under 15 U.S.C. §1635(d) or 12 C.F.R. §226.223(e), since it is a typed provision that could not possibly meet the "handwritten" and "bona fide emergency" requirements for a rescission period waiver under TILA.  They set up the illusion that Rand claims they waived their rescission rights, only to quickly knock it down.  Here, only their signatures are handwritten, and there is certainly no mention of any financial emergency in the Confirmation section of the rescission form.  In fact, there is not even a mention of a waiver in the Confirmation section.  If they were successful with this argument, any consumer could pull out a document from a real estate closing within the three prior years, and successfully revive their rescission rights.  As in this case, it would most likely be attempted by a consumer faced with a foreclosure, and looking for a way to avoid their contract rights.

Thus, if the Mouas were successful in arguing that the Confirmation section is actually Rand's improper attempt to have the Mouas waive rescission rights, the Court would be forced to give the Mouas a three year rescission right. A flaw in this logic is that Rand never claimed the Mouas waived their rescission rights. Another flaw is that their interpretation of the Confirmation section as a waiver defies logic and common sense.

In any case, the undisputed facts demonstrate that the Mouas received the full benefit of the three day rescission period, since the mortgage loan did not fund until April 27, 2005, which was the next day after their rescission rights expired. The disbursement checks from the closing are attached to the Lawrence affidavit as Exhibit 1, and each is dated April 27, 2005. The checks were all cashed between May 2, 2005 and May 4, 2005. The Mouas clearly had their rescission rights, but failed to exercise them by April 26, 2005.

III.  **THE ONE YEAR STATUTE OF LIMITATIONS BARS ANY CLAIM FOR DAMAGES UNDER TILA OR HOEPA.**

If the Mouas actually suffered damages from the waiver of their three day waiting period, or believed it was invalid, they had an available remedy for the recovery of actual and statutory damages, but only if commenced within one year of the date of the closing. 15 U.S.C. § 1640(a). The Mouas did not bring a cause of action for damages however within the required one year statute of limitations period, and now are barred from asserting any damage claims under TILA or HOEPA. The Mouas' legal counsel acknowledged at the hearing on the TRO motion that the Mouas did not commence a timely action for TILA or HOEPA damages, which raises questions of the propriety of the damage claims asserted in the Mouas' current Counterclaim in this action. Any claims for actual or statutory damages under TILA or HOEPA must be dismissed as a matter of law.

18

IV.    **THE CONSUMER FRAUD CLAIM FAILS TO STATE A CAUSE OF ACTION DUE TO THE ABSENCE OF THE "PUBLIC BENEFIT" NOW REQUIRED BY THE MINNESOTA SUPREME COURT, AND THE MOUA'S FAILURE TO ALLEGE FRAUDULENT CONDUCT AGAINST RAND.**

Minnesota Statutes section 325F.69, subd. 1 ("**Consumer Fraud Act**") provides that a person cannot use "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice" in an attempt to cause people to rely on the information when selling merchandise.  Chapter 325F authorizes only the Minnesota Attorney General to bring actions under this chapter.  A private cause of action does not exist under the Consumer Fraud Act, but in very limited circumstances, a private cause of action may be available under Minnesota Statutes § 8.31.  Generally, there is no availability of a private cause of action in one-on-one transactions.  In order to prevail on a claim under the Consumer Fraud Act, the Mouas must prove that their lawsuit provides a "public benefit" and that Rand actually made misrepresentations of material facts that have a causal link to actual damages.  Because the Mouas can prove neither element, their Claim under the Consumer Fraud Act must be dismissed with prejudice.

Recent Minnesota Supreme Court decisions have greatly narrowed the scope of availability of the private attorney general statute under section 8.31 of the Minnesota statutes, which would be the only basis for the Mouas to assert a cause of action under the Consumer Fraud Act.  The Mouas must admit that the statute by its terms does not allow a private cause of action.  Since 2000, the Minnesota Supreme Court and other Minnesota courts addressing the issue have placed substantial limits on the availability of such a cause of action or the recovery of attorney's fees under the private Attorney General's statute.  In fact, courts have enforced the narrowing of the Consumer Fraud Act's availability specifically in the area of mortgage lending,

as discussed below.

In *Ly v. Nystrom*, 615 N.W.2d 302 (Minn. 2000), the Minnesota Supreme Court narrowed the availability of a private right of action for violation of the Consumer Fraud Act and overruled a previous Minnesota decision in *Church of the Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1 (Minn. 1992) to the extent this case could be construed to permit recovery absent a showing of public benefit.  615 N.W.2d at n. 25.

The court concluded "that the legislature could not have intended to sweep every private dispute based on fraud, and falling within the Consumer Fraud Act, into a statute where attorney fees and additional costs and expenses would be awarded, because to do so would substantially alter a fundamental principle of law deeply ingrained in our common law jurisprudence--that each party bears his own attorney fees in the absence of a statutory or contractual exception." *Ly*, 615 N.W.2d at 314.

The court held that the private Attorney General statute "applies only to those claimants who demonstrate that their cause of action benefits the public." Id.  The court observed that the plaintiff in that case was defrauded in a single one-on-one transaction in which the fraudulent misrepresentation was made only to the plaintiff. Consequently, the court ruled, the plaintiff's successful prosecution of his fraud claim did not advance state interests and had no public benefit, and thus was not the type of claim "that could be considered to be within the duties and responsibilities of the attorney general to investigate and enjoin."  *Id*. at 315.

The Court in *Ly* concluded that the plaintiff's claim lacked sufficient public benefit because the fraudulent misrepresentation occurred in a one-on-one transaction and was made only to the plaintiff. *Id*. at 314.  In the course of its decision, the court gave some guidance as to

other factors that might be considered in determining whether a particular cause of action had public benefit: have the legal services benefited a class of persons, not just the particular litigant, *Id*. at 312 n. 18, *citing Martin v. Hancock*, 466 F.Supp. 454 (D.Minn.1979); and whether the fruits of a successful investigation would be available to others and the attorney general, *Id*., at 314 n. 24.

In the specific areas of mortgage lending, Minnesota state and federal courts have touched upon the need for a plaintiff to demonstrate a public benefit in order to recover attorney's fees pursuant to Minnesota Statutes section 8.31. *Davis v. U.S. Bancorp*, 383 F.3d 761 (8th Cir. 2004), involved allegations of fraud in the context of a mortgage loan application. The Eighth Circuit in *Davis* recognized the limitations imposed by the Minnesota Supreme Court and understood that "[l]itigation over an alleged misrepresentation that was made only to one person does not advance state interests and enforcement has no public benefit." *Id*. at 768. Further, the Eighth Circuit reasoned:

> The class of plaintiffs under the private attorney general statute would be limitless if we assumed that one individual's negative experience with a company was necessarily duplicated for every other individual and on that basis treated personal claims as benefiting the public. Such an assumption might well render nearly every private suit alleging fraud a public benefit case. Davis had a private transaction with U.S. Bank in which poor communication and confusion on both sides resulted in the cancellation of a purchase agreement.

*Id*.

On the basis of Davis being limited to complaining only about her individual experience with U.S. Bank, the Consumer Fraud Act claim was dismissed entirely. In *Scally v. Norwest Mortgage, Inc*.,

21

2003 WL 22039526 (Minn. Ct. App. September 2, 2003), the Minnesota Court of Appeals affirmed a district court holding that a claim under the Consumer Fraud Act failed because the suit would not benefit the public.  The plaintiffs in the *Scally* case accused Norwest Bank of defrauding her during a one-on-one interaction with a bank officer over efforts to refinance a mortgage and credit card debt.  Scally argued that a successful prosecution of her Consumer Fraud Act claim would serve the public good by deterring lenders from defrauding their customers.  The Court of Appeals, however, reasoned that the interaction between Scally and the loan officer was a one-on-one interaction, not involving other consumers, and concluded that a "metaphysical potential" for a public benefit does not support a claim under the Consumer Fraud Act.  *See also*, *Behrens v. United Vaccines, Inc.*, 228 F.Supp.2d 965 (D.Minn. 2002).

These Courts have held that, under the Consumer Fraud Act, a private litigant is acting in lieu of the attorney general and that the private litigant's roles and duties are defined by the scope of the attorney general's roles and duties, which is to protect the public rights.  *Behrens*, 228 F.Supp.2d at 969; *Ly*, 615 N.W.2d at 313.  If the private litigant were able to bring a cause of action under the Consumer Fraud Act without proving an element of public benefit, "every artful counsel could dress up his dog bite case to come under an attorney's fees statute."  *Id*. at 971 (*quoting Ly*, 615 N.W.2d at 312.)

## A.  The Mouas' Cause of Action Does Not Provide a Benefit to the Public.

It is clear that the Mouas have failed to articulate any public purpose or benefit posed by their cause of action.  The Mouas seek redress for unspecified damages they allegedly suffered at the hands of Rand.  *See Behrens*, 228 F.Supp.2d at 972.  The Mouas did not seek any injunctive relief to prevent Rand from offering its services in the future or entering into loan transactions

with other parties.  *Id.*  Rather, the Mouas seek the return of the Property or money damages for the alleged injuries they have sustained.  Such a cause of action is improper under the Consumer Fraud Act and should be dismissed.  *Id.*

Again, Minnesota courts have greatly narrowed the availability of a private cause of action under the Consumer Fraud Act.  The Mouas negotiated a single transaction with Rand for the refinancing of a single parcel of real estate.  The nature of the transaction is a private contract between two litigants, which does not fall within the scope of the Consumer Fraud Act because it will not provide a public benefit.  Only the Mouas are benefiting by protracting this litigation to avoid the inevitable eviction.  Their purported claims under the Consumer Fraud Act must be dismissed as a matter of law.

Because the Mouas have failed to prove that their cause of action benefits the public, Rand is entitled to summary judgment and the Mouas claims under the Consumer Fraud Act should be dismissed in its entirety with prejudice.

**B.  Rand did not Misstate or Misrepresent any Information to the Mouas with the Intent that they Rely on such Information and there is No Causal Link between any Alleged Conduct by Rand and any Damages Allegedly Suffered by the Mouas.**

The Mouas have failed to produce admissible evidence that Rand utilized deceptive practices, made any false promises, misleading statements or misrepresentations to the Mouas at any time.  The vast majority of the assertions made by the Mouas relate to the conduct of other parties, not Rand.  Even if the Court accepts the Mouas' version of the facts surrounding the

23

transaction, such conduct by the Remax/Results agent and the Excel Title closer, does not amount to a violation of the Consumer Fraud Act against Rand. Rand simply made a mortgage loan to the Mouas.  It is undisputed that no representative from Rand Corporation was present at the closing.  (Lawrence Affidavit at ¶ 4.)  The Mouas clearly admit they were approached by a ReMax Results real estate agent, Patrick Aylward, not Rand, and that the alleged promises and misrepresentations were made by Aylward.  (Answer at ¶¶ 9, 19-26, 103.)  The Mouas further admit that the Excel Title closer, not Rand, conducted the closing and either directed them to sign various documents or failed to provide them with information.  (Id. at ¶¶ 39-41, 51.)  Rand did not make any alleged deceptive misstatements, an express requirement of the Consumer Fraud Action.  Section 325F.69, subd. 1.

Further, the Mouas have not shown that any alleged misrepresentations by anyone caused any damages, or that any damages actually exist.  Certainly, a foreclosure proceeding is a natural consequence of a failure to make mortgage payments, and a wage earner's total disability from health problems necessarily will lead to a substantial drop in income.  The Mouas have not provided any information indicating that they would have determined to forego the transaction had they been given the disclosures three days before the transaction.  In fact, the Mouas first contacted Rand in January, 2005, more than three months before the transaction was consummated on April 22, 2005.  (Miller Affidavit at ¶ 8.)  At that time, the Mouas were given all of the properly completed disclosures.  (Id.)  Between that time and April 22, 2005, the Mouas requested an increase in the loan amount and amended disclosures were given at closing.  (Id.)  As such, the April 22, 2005 was the end of a long process in which the Mouas had ample time to determine whether to go ahead with the mortgage loan.

Further, as discussed below, any discrepancy in the information stated in the disclosures was not harmful to the Mouas.  In fact, the net effect of the APR figures included in the disclosures were overstated by about .65 percent.  (Exs. 1-2 to Complaint.)  As a result, the Mouas were obligated to pay less money than was disclosed to them.  As a matter of law, the Mouas cannot claim they were damaged as a result of this net overstatement.

### III.   STRONG PUBLIC POLICY CONCERNS REQUIRE THAT PRIVATE CONTRACTS RIGHTS BE RESPECTED AND REMAIN ENFORCEABLE.

Minnesota Courts have long established that the freedom to contract is an important right in Minnesota.  *Rossman v. 740 River Drive*, 308 Minn. 134, 136, 241, N.W.2d 91, 92 (1976); *Perkins v. Hegg*, 212 Minn. 377, 379, 3 N.W.2d 671, 672 (1942).  In fact, the policy is so engrained in American society that the ability to contract has been protected from governmental interference by the Constitution.  U.S. CONST. AMENDS. 5, 14; MINN. CONST. ART. 1 § 7.

Public policy requires that the court uphold and protect the freedom to contract among private parties.  The court must not allow the Mouas to avoid their contract obligations simply for the asking, by claiming they didn't read English well or that they didn't understand the contracts they signed.  If they could do this by simply signing an affidavit, no borrower would ever be bound by their lending contracts if they didn't want to be bound.  Despite the fact that the Mouas are recent immigrants and despite how the Mouas' attorney portrays his clients, the Mouas were property owners and commercial business owners who benefited from American commerce.  The Court cannot allow the Mouas to benefit from this commerce when they see it fit, but allow them to disregard their obligations when it is inconvenient for them.

The Mouas had ample time to consider whether to enter into this contract with Rand.  In fact, they initially applied to Rand for a mortgage loan in January of 2005, approximately three months before they consummated the transaction.  (Miller Affidavit at ¶ 8.)  Rand was clear that it did not represent the Mouas and the Mouas could have retained assistance from someone if they needed help in reading or understanding the loan documents or in determining whether to enter into the transaction at all.  Thus, the Mouas had more than three months in which to review the TILA and HOEPA disclosures, shop rates with other lenders and consult with someone that could explain the terms, translate from English or conduct any further due diligence they deemed necessary.  It now appears they did nothing during the three months.

The Mouas however seem to claim they quickly consulted with their son within three days after the closing on April 22, 2005, and fully and miraculously understood the transaction enough to feel they needed to rescind within the three days, but also claim they gained an understanding of the transaction well enough within those three days to believe they thought they waived their rescission rights on the Notice of Right to Rescind form.  The story rises to a level of such implausibility that the Court must protect against the Mouas using this Court to unilaterally alter private contract rights, as a matter of public policy, and to protect Rand from becoming a fraud victim.

Taken to the extreme, if the Mouas were successful in avoiding their contract obligations under their mortgage loan with Rand, based upon their unverifiable claims they didn't understand their contract rights, any consumer could avoid the legal consequences of failing to make their mortgage payments.  Once such unscrupulous acts became widespread, lenders would be forced to stop making mortgage loans to immigrants that didn't speak English or other

26

selected classes of potential borrowers that likely would deny liability of lending contracts.  The

lending industry would quickly fall apart.  Certainly, it's hard to believe that these extreme

consequences would ever occur to the U.S. economy, but it's equally hard to believe that the

Mouas (as commercial land and business owners) didn't understand anything about their

mortgage loan transaction.

### IV.   RAND DIDN'T VIOLATE MINNESOTA STATUTES SECTION 58.137 BECAUSE THE LENDER FEES DIDN'T NOT EXCEED FIVE PERCENT OF THE LOAN AMOUNT.

The Mouas argue that Rand violated Minnesota Statutes section 58.137, subd. 1 because

the lender fee exceeds five percent of the loan amount.  (Answer at ¶ 103a.)  The Mouas

statement of facts is simply incorrect.  Section 58.137, subd. 1 defines a lender fee to include

"interest, points, finance charges, fees, and other charges payable by the borrower to any

residential mortgage originator."  The lender fee specifically does not include "recording fees,

mortgage registration taxes, passthroughs, or other amounts that are paid by any person to any

government entity, filing office, or other third party that is not a residential mortgage originator."

Section 58.137, subd. 1. The loan amount in this transaction was $245,000.00 (Ex. 7 to

Complaint.)  The total settlement charges for the transaction were $24,164.19, which is about

9.8% of the loan amount.  (Id.)  However, many of those charges cannot be included in the

lender fee under section 58.137, subd. 1.

Of the amounts included in the settlement statement, only three items constitute lender

fees under Chapter 58.  (Id.)  Those three are the loan origination fee in the amount of $3,675.00,

the mortgage broker fee in the amount of $4,521.61, and the commitment fee in the amount of

$3,675.00.  Section 59.137, subd. 1.  The total for these three figures is $11,871.61, which is

only 4.8 percent of the loan amount, and below the 5% threshold under Chapter 58 of the Minnesota statutes.  The remaining settlement charges are recording fees, service fees, insurance fees, etc.

Another shortcoming with the Mouas' claims under Chapter 58 is that it is solely a regulatory statute, and creates no private cause of action or the ability to change or affect contracts between private parties.  It is exclusively an enforcement statute, whereby the Minnesota Department of Commerce has the authority to handle license issues, including censure, revocation of licenses for mortgage originators and imposition of civil penalties by the commissioner of the commerce department.  If the Legislature had intended that a private cause of action existed for violations of Chapter 58, or that the contracts of mortgage originators violating the provisions of Chapter 58 could be altered or nullified, the Legislature could and presumably would have included appropriate provisions in Chapter 58.  Even if section 8.31 of the Minnesota Statutes, which does create a private cause of action for various consumer protection statutes in order to advance a public benefit, does not expressly allow a private cause of action under Chapter 58.  Even if Chapter 58 came within the scope of the private attorney general statute, the absence of the requisite "public benefit" would bar the claim.  Thus, the Mouas' claims under Chapter 58 must be dismissed as a matter of law.

## **CONCLUSION**

Based upon the foregoing, Rand is entitled to summary judgment on Count I in the Complaint for a Declaratory judgment under TILA and HOEPA that Rand did not violate either statute, and that the Mouas did not have a continuing right of rescission beyond their statutory

three day right, which they failed to exercise, and that Rand is now the fee owner of the Property and entitled to possession due to the completion of the foreclosure sale.

Rand is also entitled to summary judgment on the Mouas' damage claims based upon the one-year statute of limitations that bars claims for actual and statutory damages brought more than a year after the transaction. The state law claim under the Consumer Fraud Act must also be dismissed as a matter law, based on the absence of a "public benefit" as required by the Minnesota Supreme Court since 2000.

**WILFORD & GESKE**

Dated: March 16, 2007            By:      s/ Eric D. Cook
                                         Eric D. Cook, #218807
                                         Christina M. Weber, #034963X
                                         Attorneys for Plaintiff
                                         7650 Currell Boulevard, Suite 300
                                         Woodbury, Minnesota 55125
                                         (651) 209-3300